Court, Your Honor. You may proceed. Thank you. Good morning, and may it please the Court. Matthew Reed for Appellant. Molly Vogt. I will plan on saving three minutes for rebuttal. All right. The way our clock works, it just keeps running. So if you want to retain it, you need to stop yourself. Understood. After Joshua Vogt died in their custody from a drug overdose, his jailers or others protecting them watched and then intentionally destroyed the only video showing him inside the cells where he seconded and died. That video was the only objective evidence of Mr. Vogt's condition and what his jailers perceived during the last hour of his life, besides seven seconds of footage showing them all but carry Mr. Vogt to the cell where he died. A rational jury could conclude that the defendants intentionally destroyed that video then concealed that misconduct for more than two years because that video contradicted the officer's self-serving testimony and supported a finding that they had. Counsel, let me interrupt you because you said it three times. Don't you overstate the record because I take it that the best picture you have of this holding room is the one you put on page 13 of your brief. And I believe there's another figure as well which shows from the inside. Yes. And I'm going to ask you that you anticipate well. I'm going to ask you, that is taken head-on at eye level, right? That is not taken from the camera angle that's shown on your page 14, right? That's correct, Your Honor. Nothing in this record has anything taken from the angle of 14, correct? From camera 18, yes. That's correct, Your Honor. Right. Nothing has its view in any way or from that in any way, correct? Correct. Because like I read your brief, like I heard your opening argument, like we did know what camera 18 could see. On this record, can we even see what camera 18 could see? Well, we can, Your Honor. And I would point to, first, the district court's finding, which is at addendum 65, noting that there would have been a view into the court-holding cell. And there's a view. Do they use the word partial in that sentence? It certainly would have been a partial view. Partial or partially is in the very sentence you cite, isn't it, counsel? That's correct. That's correct. And certainly, Your Honor, we don't contend that it would have seen the entirety of the cell. But I think this is really where the adverse inference comes in, right? You can't spoil the objective evidence, the camera footage that would have definitively shown what that we would know what it showed if we had the footage. This is a permissive inference. That's correct. A jury could. Not a mandatory inference. Absolutely. That's correct, Your Honor. And a jury could conclude from the district court's findings, from the testimony about what that camera could have shown, and come to the conclusion that it would have captured additional evidence of the officer's deliberate indifference in this case. And, of course, the jury could conclude otherwise. And I do just want to underscore that point. We are not asking for summary judgment. We are not asking for this Court to find as a matter of law that we win this case. We are just asking for the opportunity to demonstrate a genuine dispute of material fact, given that the defendants in this case intentionally destroyed what is inarguably highly probative evidence. And so, just to focus on the ---- But you want to proceed to trial with an appropriate instruction with respect to the missing video. That's correct, Your Honor. And as the Auer decision, Auer v. City of Minot case, makes very clear, it's inappropriate for a district court to grant summary judgment under these circumstances where there is lost evidence that could have generated a genuine dispute of fact on the record that we have. And ---- Well, can you really get to a jury based on the missing camera alone? That's not what we contend, Your Honor. And I'm happy to walk through some of the facts that I ---- the two pieces where the video, I think, is most critical to our case. So, the first is that the magistrate judge relied very heavily on the fact that there were these eight well-being visits to the court-holding cell, which was the cell in which he died. But, of course, we have no idea what the officers saw in that cell and no way to test their testimony about what they saw because they destroyed the only objective evidence giving us a view into the cell. It may well be that all that testimony is not credible. We just simply don't know. And this is not a case where defendants offer undisputed testimony and there is nothing on the other side of the equation. There was something on the other side of the equation, but we no longer have it. And so to ask us to sort of guess as to, you know, what the video might have shown and, you know, identify specifically exactly what it would have depicted is essentially to ask us to recreate evidence that we no longer have. And that's a task for the jury, as this Court has made very clear in the Auer case and has, and as the Morris decision also discusses. Well, what would you argue that the jury should conclude from the missing camera? Are you allowed to just argue that, well, what would be the evidence that you could derive from the missing camera? So I think there are two pieces, Your Honor, that are critical. So the first are the eight visits point. So the officers say that when they performed the well-being checks, that Mr. Vogt was in essentially the same condition that he was in at previous times. What are you going to argue based on the camera? That it may well have shown his condition worsen and that he had a very serious and obvious medical need that would have satisfied this Court's standard. And I would point to our expert testimony, which describes the additional symptoms that he would have suffered as a methamphetamine, during a methamphetamine overdose, from which a jury could conclude that those symptoms would have been visible at the time. And there were also, I would note, symptoms that the officers noticed when they finally did enter the court-holding cell, in which we discuss in our brief, which may well have been visible earlier had they, you know, checked more closely or had the — and that they may have seen when they looked into the court-holding cell, but simply disregarded. So I guess, if you're correct, at such a trial, the jury would be instructed as to the permissible manner in which it could interpret the fact that the video is missing. So — I mean, you're not saying you would be permitted to just argue whatever you want. Wouldn't it be constrained by an appropriate jury instruction? That's correct, Your Honor. And it would be constrained also by the fact that, you know, it's the boundaries of what a rational jury could conclude. You know, we're not going to stand up there and say, you know, an alien spaceship came in and took him out of the cell during the middle of this occurrence. It's all confined by what's rational to infer from what we could have seen on the video, from what the record tells us we could have seen from the video. But those are the sort of limitations that would — that would cab in the adverse inference. And, of course, if a jury returns a judgment, and we see these types of cases all the time, such as — such as in Morris, the defendants can take their appeal, and they can say, you know, the adverse inference was improper and the jury instruction should have been more narrow. And those are all issues that we can address at the district court. But just to turn to what I think is the second and probably the more critical inference from this video, there is — the appellees rely extremely heavily on Sergeant Imgrin's testimony, that during his one-on-one conversation with Mr. Vogt in the group holding cell, that he attributed his symptoms to an anxiety attack, and that the sergeant did these breathing exercises with him that supposedly eased his symptoms. Now, I think there is some basis in the record, and we point this out in our brief, on which a rational jury could disbelieve that — that claim, even aside from the adverse inference. So just as some examples, we — we know that from the booking form that a rational jury could conclude that, in fact, Mr. Vogt did tell Officer Blum during his booking that he had taken drugs. But that was disregarded subsequently. Was that within a certain period of time, counsel? When Officer — No, no. Was — when he had taken drugs within a certain period of time before they were asking the question. Is that in the — in the note? If I understand the question, it's not exactly clear from the record exactly when Mr. Vogt took the drugs. Right. But — Was the question also vague about what period of time that you took the drugs? That's what I'm really — But the response is certainly clear. So the response from the booking form was, on something right now, and — and something to the effect of not sure what it was. And — and so — so that is what we have in the record. And the — the booking form citation here is — is R. Dock 90-6 at 2, on something right now, but wasn't sure what he had taken. But that — so — so even — we have that testimony. And we also have the fact that, you know, Sergeant Imgrin's account of the breathing exercises sort of gradually evolves and becomes a little more embellished as he, you know, he has a statement with the county investigator, and then he subsequently, you know, adds, well, I did these breathing exercises. And then he, in his deposition testimony, he adds that he had this long colloquy with Mr. Vogt where he said, are you sure you — you haven't taken drugs? And he says, no, sir, I haven't taken drugs. Right? So — so all of that seems a little bit incredible. But Camera 18, we know from Captain Fosterson's testimony, it would have shown him sitting on the chairs in group holding. That's at Appendix 166. So a rational jury could conclude that the defendants destroyed that evidence precisely because it showed that Mr. Vogt was unresponsive, you know, falling off the chairs in group holding in Sergeant Imgrin's account in his first statement to the county investigator. It may have shown that he was unresponsive, incoherent, unable to remain conscious or upright on those chairs. And that's all consistent with our expert's testimony. And it's an entirely reasonable inference for a jury to draw from the intentional destruction of the only objective evidence of his condition at the time. It's no wonder that this video and none of the other videos in this case were spoiled. And I'll just add one more thing before I reserve the rest of my time, which is I really encourage this Court to focus on the facts that the district court found in its foliation order. The defendants, from the day after Mr. Vogt passed away, they represented repeatedly, over and over again, we don't have video in the booking cell. We sent an interrogatory. Identify the cameras. They said camera 17 and camera 19. No mention of camera 18. And it comes out in a deposition testimony near the close of discovery. That supported a powerful finding that they intentionally destroyed this evidence and that, under this Court's precedence, created a genuine dispute of material fact, alongside the rest of this record, which we submit gets us to a jury trial. Unless the Court has further questions, I will reserve the rest. Why don't you address the district court's statement in the order about why the camera missing camera was not sufficient. The judge says even assuming camera 18 captured at least a partial view of the 8 minutes, he was in group holding. It was the combined observations of Vogt by Blum during booking and his subsequent stumble that plaintiff claims would have made it obvious to a layperson that he needed medical care, not before. What's wrong with that analysis? Well, a few things, Your Honor. So the first is, I've really been puzzling over where this fixation over the stumble comes from, because it certainly doesn't come from our papers. We never limited our theory to only the events preceding and at the moment that he stumbled into the door of the group holding cell. And the magistrate judge, in that opinion, offers no analysis whatsoever of what the adverse inference would have shown with respect to what took place afterward when he's in group holding speaking with Sergeant Imgrin or after he is carried to the court holding cell. So that would be the first point. And then, you know, and I would point you to Doc 89 of the record at pages 5 and 6, which is where we explicitly argued in opposition to their motion for summary judgment where they characterized our position as only claiming that the post-1234 A.M. events were relevant. We expressly said that his symptoms were worse and obvious to a layperson after his move to court holding. And that's the first point. But, of course, there would be no reason to say that if none of that material was relevant under our theory of the case. Of course, the officers could have been deliberately indifferent after that time, and I would submit that alone would justify reversing the district court under this court's decision in the Auer case. Okay. Thank you for your argument. Thank you, Your Honor. May it please the Court. Ms. Shui, we'll hear from you. Thank you, Your Honor. May it please the Court and Counsel, my name is Jessica Shui. I represent the individual defendants in this matter. Your Honor, I want to – Your Honor Colton, I want to come back to the question that you just asked.  On camera 18, at a particular moment in time, there was an answer to the fact of the court and the parties fixated on the stumble. And here's why. And I'm also asking that the decision below be affirmed. Mr. Vogt chose to eat two bags of meth and not tell anyone about it. It started a window of time by plaintiff's expert's testimony as to when his life might have been saved. The expert was Karen Molner. Her deposition transcript is in part – certain portions are put in the appellate appendix here, but it's 90-7 in the record. I would invite the court to read it in its entirety to have an understanding of what the district court judge did here. Concept being that in order to even have a shot at saving his life, medical intervention would have had to start at 1234 a.m. Mr. Vogt would have had to have been in a facility where they had charcoal, ECMO, and the ability to basically siphon this two bags of meth out of his body and try to save his life, starting at 1234 a.m. That's why the court in its decision says, look, I'm going to look at the 1234 timeframe. I'm going to look at what cameras are available there. And I'm going to assume that there was an objective need for medical at this point. So the question being, and the question for this court, is there a genuine issue of material fact as to whether these individual defendants acted with a criminal, reckless disregard, that level of intent? And the judge says, no. I can see by the camera angle that exists, this one would be 17 and 19, that the officers are interacting with him at that point in time. Now, on this conversation, the reference with Sergeant Imgren talking to Mr. Vogt, and they're having a discussion about, is this anxiety? Is this drugs? Well, Counselor, there's no audio, right? We don't really know what we're saying. You didn't have a lip-reading specialist or anything, right? Correct. And that's one of the things I wanted to come to. Okay. Proceed. No one has any audio on that. So there's nothing exfoliated there, which means it would not be available to the jury on this permissive inference. And going to what forms the mind of the individuals involved. The component of it being viewable, it is inaccurate to say that camera 18 would have captured that portion of group holding two. We don't know on this record, do we, Counsel? We don't. As Your Honor asked. Well, you didn't put it in either, right, as to what we could see. Correct, Your Honor. I did not. Okay. Proceed. Yes. It was not asked for in discovery, and I didn't put it in. It's put in through testimony. So there's no image. But in the testimony, Boston says it captures a portion of it, not the portion where they are sitting. Okay. The court's finding is at least a partial view. Proceed. Correct. At least a partial view. Correct. And exactly. So on those points, the court ends up saying, under these circumstances, it's not a genuine issue of material fact because there's enough sufficient information that allows us to determine the mind of the individuals, these individual defendants. Well, Counsel, please, at some point, you need to address our case and hypothesize what a rational jury could hypothesize from the intentional destruction of camera 18. What can a rational jury hypothesize from the intentional destruction of the tape from camera 18? I think that's the key here. So we'll start at – there's two points in time, right? So there's 1234 and then after 1234. Remind me, when is the – where is the man at 1234? So shortly after – at 1234 is approximately the time that he stumbles and goes into group holding two. And that's where the chairs are, where the conversation has held about the anxiety. Shortly after that, I believe it's approximately 1241, he's escorted over to court holding. That's where he – 1241. Right. And that's where he later passes away. And so that – and that's where the missing camera is relevant? Has the most direct impact to it, yes. 1241. So – At 1234, you're making this medical argument that the intervention would have been necessary at 1234 and at that point, the missing camera is not really pertinent. Right. Exactly. And so that's – to talk this out a little bit more. I mean, you're trying to say even if the camera showed he was in distress at 1241 or after, it's immaterial? Correct. And that results from – And undisputed? Or is that just your expert's view? No, that's their own expert. That's – Karen Molnar says, 1234, and that's her deposition testimony. I started from the beginning and it goes all the way up through page 19, and I walk her through the exercise. What are the variables as to how you try to save a person's life knowing this is a metabolic drug? So it metabolizes them in the body. Seven different factors on the times of and types of things you can do to attempt to save someone's life in this circumstance. And one of the primary things being activated charcoal, and that only a few institutions have that. None of them in close proximity to Crow Wing. And that he had to be on ECMO to manage his heart and lungs at the time. So she ends up testifying, but by the way, ECMO was not available. He would have had to have been airlifted. This was part of the whole conversation with her. So it ends up – she ends up testifying, would not have been able to – to a reasonable degree of medical certainty, cannot say that he would have been able to save his life unless it was in a hospital at 1234 a.m. Counsel, did you argue that in your brief, this theory you're presenting here today? In part. So there was – the focus – I didn't get that impression. Right. So I put it in the – well, what I did is I put it in the footnote. I said, look, we argue causation below. I'm trying to explain the reason why, if you look at Judge Leung's analysis on the summary judgment motion, and he's addressing camera 18. He talks about camera 18 at 1234, and what's happening at 1234, including this conversation about anxiety, and concludes that it doesn't have an impact on the case. So that's why it's relevant to the court in its analysis, because, as Judge Colton was just asking me, what about the timeframe after? In fairness to the court, Judge Leung did not specifically address that in the portion of the decision that Judge Colton was reading about ten minutes ago. I'm sure he did not address it because it's established by plaintiff's expert that in order to save his life, the time is 1234. But for this court, I'm also going to address why I don't think camera 18 negatively impacts or prevents summary judgment after 1234. I'll say after 1241. He's then 18. Okay. Here's why there. We have the – there's no angle in the record that shows what the angle would have been. There's oral testimony that says it's a partial view. You can only see into a portion. When he's lying down, you can't see it. Now we go back to – excuse me. Coming back to your question, Judge Bratton, what would the evidence be under – and there was a series of questions to my opposing counsel. What would the evidence be? What could they say to the jury? Who could they hypothesize? They – right. Hypothesize is our legal standard. There you go. What could a rational jury hypothesize? Go ahead. Okay. Here's what we've got from Molnar because she's the one that's putting in the testimony. What would he have looked like? The tremors would get significantly worse, and I'm reading from appellate page 188. This is appellate appendix 188. Line five. The tremors would get significantly worse, and he would start to become delirious and more incoherent. He probably would not be able to ambulate on his own without assistance or even with assistance. Meaning, consistent with what was testified to, he was lying there. He could be lying on the floor, counsel. Could be lying on the floor. And you notice you can almost see the floor on their head-on view. You notice that on 13? That's a toilet back there, right? A toilet and a water? Correct. And you can see the bottom of the toilet for sure, pretty close to the floor. So even the head-on view, you can see the back of the floor, right? Yes, Your Honor. And this is the head-on. This isn't even a good one. No. Right. And the camera is so that we're on the same page. The camera is not in the cell. Correct. It's like this courtroom where it's at the back. Like on page 13. Right, which would be taking the image from the courts bench. So someone is behind the bench and going that way. But that's an up angle, right? It's not the same as a down angle. 18 is down into the cell. Camera 18 is down in the cell, right? From behind, down. Down into the cell. Yeah. Proceed. Okay. So she says he would have had difficulty tracking, holding a conversation, maybe even just speaking in general. Okay, so we're back to there's no audio. Testimony is there's no conversation with him until he raises the hand. And the camera angle that we do have, 19, you can see the eight times that we've got people going there checking. And it's party correctional officers and non-party correctional officers, which was relevant in Reese, the issue by this court. No one is talking to him in those. It's not until the very end when Imgren is starting to go in that you can see someone is talking. So the fact that the camera is gone wouldn't have had any input on the things that Molnar is saying would have been observed or could have been observable, right? Because there is no conversation being held. He's lying there. And that's the extent, if you continue through here, of what would have been observed, similar to what they had already observed. Counsel, this is how I interpret the argument you just made. It is that whatever the video footage on camera 18 was or is, it could make no difference in this case. Ultimately, using their own expert's testimony because it was consistent with what they already observed. Okay, if that's the argument, how does that mesh with an adverse inference? Is there not, is there no consequence to the custodian of a video footage like this failing to produce it? You say there's no, it would make no difference, but yet we have an adverse inference. How do those two coexist? There's no difference here, ultimately, because the evidence that plaintiff would be putting in, I'm giving them the most favorable inference is what I just read from Molnar's testimony. That's why in this particular case, consistent with other cases that discuss foliation of evidence in conjunction with summary judgment, there needs to be evidence that's not insubstantial. I'm taking their expert, their expert who I actually brought a motion to have her testimony struck on due to lack of qualification. Regardless, take her testimony. What I just read to you is consistent with the officer testimony on it. It's also consistent with what they had already observed. And this lower court judge said, I'm looking at the case law on these issues, and these officers did not have a criminal culpable state of mind. They were checking. Effectively, they may have been laboring under a misapprehension of what the medical circumstances were. Anxiety versus drugs, what's going on? But it wasn't a criminal state of mind. They were continuously attending to them, both prior to 1234. My time is running out, so I won't go through the 1234. Judge Leung is very detailed in both of his decisions, the foliation decision, as well as the summary judgment decision, very accurately cites the record. So I won't go through 1234. 1241, I think we've adequately fleshed out here. Even if you took Molnar's deposition testimony, it's not enough to defeat summary judgment in this instance. Unless Your Honors have any additional questions, I respectfully request that the Court affirm the decision below. Thank you. Very well. Thank you for your argument. We'll hear a brief rebuttal. You may proceed. Thank you, Your Honor. I want to just hit three quick points. So first on causation, this issue is waived. And we know this because at page 703 of their brief, they observed that the Court did not actually address this issue. They don't make any argument that that finding should be reached in the first instance by this Court. And this Court's usual practice is to not reach issues that the district court has not addressed. And I would just add on that point, too, that the causation issue is likewise inflected with the adverse inference. As you noted, Your Honor, the question of what that video could have shown, that and our expert expressly testified that what that video would have shown would have had some bearing on her opinion in this case. There was some question about whether our own expert testified entirely in support of their case. That's simply not correct. I'd point you to pages 74 and 75 of the deposition transcript. I'll just read this. That being said, here's the question. Which witness are we talking about? This is Karen Molnar, our medical expert. To a reasonable degree of medical certainty, are you claiming that an act or omission of the defendant's, including the alleged failure to timely seek emergency medical intervention, was a substantial causal factor in the death of Joshua Vogt? Answer, yes. Okay. How can you possibly reach that conclusion with all the variables present here? Answer. I would say based on the fact of his behaviors as well as the progression of his symptoms that the officers did identify and have been on record. And the other, the last thing I'll note here is with respect to what camera 18 would have shown, that's a fact question. At appendix 166, Captain Fosterson expressly testifies, would it be fair for me to understand with regard to camera 18 if Joshua Vogt had been sitting on chairs in the area as you have indicated now in group holding two? That camera may have picked him up. Is that correct answer? Yes. Of course, a rational jury could credit that testimony. And what could it have shown, though, really, that would have, that would show criminal recklessness by the officers? So this takes from If they had been told I'm having an anxiety attack and he denied taking drugs. So what the video would have, may have shown, consistent with our expert's testimony as my friend accurately recounted, which is if he was incoherent, as our expert testified he may have been, if he was hallucinating, if he was unable to speak, certainly he What would you see on a video that would tell you those things? He could have been slumped over, not conscious. His mouth would not be moving. So he's not having this conversation that Sergeant Imgrind alleges in the video. These are all inferences that a rational jury, maybe not every rational jury, but a rational jury could draw from the destruction of the State. The fact that he now testifies that Mr. Vogt told him all this stuff that is highly exculpatory for himself, and we are now at a point where we no longer have the only objective evidence that would allow us to contradict that testimony. And unless there are further questions, I thank you for your time and the privilege. Thank you.